IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 05–cv–01322–EWN–PAC

STEPHEN WALTER PHILLIPS,

      Plaintiff,

v.

THE PEPSI BOTTLING GROUP,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

      This is an age discrimination case. Plaintiff asserts that Defendant violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, by terminating his employment on the basis of his age. This matter is before the court on "Defendant's Renewed Motion for Summary Judgment," filed March 30, 2007. Jurisdiction is premised upon 28 U.S.C. §§ 1331, 1367.

## FACTS

### 1.    *Procedural History*

      On July 15, 2005, Plaintiff filed a complaint in this court, alleging he was terminated because of his age. (Compl. [filed July 15, 2005].) On August 17, 2005, Defendant filed an answer. (Answer [filed Aug. 17, 2005].)

On March 15, 2006, Defendant filed a motion for summary judgment, arguing Plaintiff

failed to establish a *prima facie* case or provide evidence of pretext.  (Def.'s Opening Br. in Supp.

of its Mot. for Summ. J. [filed Mar. 15, 2006] [hereinafter "Def.'s Br."].)  On April 19, 2006,

Plaintiff filed a response brief.  (Pl.'s Resp. Br. in Opp'n to Def.'s Mot. for Summ. J. [filed Apr.

19, 2006] [hereinafter "Pl.'s 1st Resp."].)  On May 25, 2006, Defendant filed a reply brief.

(Def.'s Reply in Supp. of its Mot. for Summ. J. [filed May 25, 2006].)  The same day, Defendant

also filed a motion to strike some of the evidence Plaintiff submitted in support of his response.

(Def.'s Mot. to Strike Evidence Submitted in Supp. of Pl.'s Resp. Br. in Opp'n to Def.'s Mot. for

Summ. J. [filed May 25, 2006].)

On June 19, 2006, Plaintiff filed a motion for continuance of summary judgment

proceedings to permit discovery to be reopened, arguing he needed to conduct discovery into two

documents, produced by Defendant after summary judgment briefs were submitted, that

purportedly raised issues essential to his successful opposition to summary judgment.  (Pl.'s Mot.

Pursuant to Fed. R. Civ. P. 56[f] for a Continuance of Summ. J. Proceedings to Permit Disc. to be

Reopened [filed June 19, 2006].)  On February 13, 2007, I granted Plaintiff's motion, permitting

Plaintiff to engage in limited discovery by redeposing two witnesses concerning the late-produced

documents.  (Order [filed Feb. 13, 2007] [hereinafter "Continuance Order"].)  I denied

Defendant's motion for summary judgment without prejudice to refiling, and Defendant's motion

to strike was thus mooted.  (*Id.*)  For Plaintiff's benefit, I made the following admonition:

> Plaintiff's initial summary judgment response contained a "statement of additional
> disputed facts" containing an astoundingly unnecessary 278 distinct factual
> allegations, the vast majority of which were either patently irrelevant or

*un*disputed.  In addition, a further number of such "additional disputed facts" were based upon what the court will generously term "*creative*" interpretations of the evidentiary record.  I encourage Plaintiff's counsel to give careful consideration to the first clause of Federal Rule of Civil Procedure 11(b)(3), for this court does not take kindly to parties who see fit to bend or break the rule.

(*Id.* at 6–7 n.2 [emphasis in original].)

On March 30, 2007, Defendant moved again for summary judgment, asking the court to take its initial summary judgment brief under consideration and emphasizing that the new evidence Plaintiff acquired did not raise any new material issues of fact and, thus, did not warrant any alterations to its initial brief.  (Def.'s Renewed Mot. for Summ. J. [filed Mar. 30, 2007].)  On April 19, 2007, Plaintiff filed a new response brief.  (Pl.'s Resp. in Opp'n to Def.'s Renewed Mot. for Summ. J. [filed Apr. 19, 2007] [hereinafter "Pl.'s 2d Resp."].)  On May 4, 2007, Defendant filed a reply.  (Def.'s Reply in Supp. of its Renewed Mot. for Summ. J. [filed May 4, 2007] [hereinafter "Def.'s Reply"].)

In its reply, Defendant states:

In his new [r]esponse, . . . Plaintiff added limited discussion concerning the [evidence yielded by additional discovery]: (1) in response to paragraph [twenty-two] of Defendant's Statement of Undisputed Facts, (2) paragraphs [thirty through thirty-six] of Plaintiff's Statement of Additional Disputed Facts, and (3) a single paragraph of the argument at page [forty-seven]. . . .  [Nevertheless,] Plaintiff rearranged and tweaked his entire response brief, . . . den[ying] [thirty-seven] of Defendant's factual allegations that he previously admitted in his initial response brief, and "clarif[ying]" . . . another [twenty-nine] admissions he formerly made without comment.

(*Id.* at 2.)  My review of Plaintiff's first and second response briefs has confirmed Defendant's shocking assertions.  (*Compare* Pl.'s 1st Resp., Resp. to Statement of Undisputed Facts ¶¶ 9–11, 14, 18–19, 22–24, 28–33, 35, 37–39, 41, 43–47, 49–54, 55, 57, 63–67, 69, 71, 76, 79–88, 90,

92–93, 100, 102–03, 107, 110, 125–30, 132, *with* Pl.'s 2d Resp., Resp. to Statement of

Undisputed Facts ¶¶ 9–11, 14, 18–19, 22–24, 28–33, 35, 37–39, 41, 43–47, 49–54, 55, 57,

63–67, 69, 71, 76, 79–88, 90, 92–93, 100, 102–03, 107, 110, 125–30, 132.)  I emphasize the

following fact: with the exception of paragraph twenty-two of Plaintiff's response to Defendant's

statement of facts, the markedly limited new evidence had *no bearing whatsoever* on the factual

issues underlying any of Plaintiff's newly minted denials or so-called "clarifications."

    Plaintiff offers absolutely no explanation as to why he now denies and "clarifies" facts that

he previously admitted in a signed brief submitted to this court.  (*See id.*)  In light of the minor

changes wrought upon the evidentiary record by the evidence uncovered after Plaintiff submitted

his initial response brief, I can only conclude that either: (1) Plaintiff's first response brief was so

replete with factual errors and omissions that its submission to the court was in brazen violation of

counsel's duty to employ the "skill, thoroughness[,] and preparation reasonably necessary for the

representation" of his client, Colo. R. Prof'l Conduct 1.1 (2007); or (2) Plaintiff's second

response brief was "presented for an improper purpose" and its "denials of factual contentions

[were] [un]warranted," Fed. R. Civ. P. 11(b)(1), (4) (2007).  Neither conclusion is particularly

flattering.

    Although it is well within my discretion to hold Plaintiff to each and every initial factual

response unaffected by the additional discovery and attested to by counsel's signature on

Plaintiff's first response brief, I will engage counsel's petty machinations.  I do so for three

reasons.  First, the effort will bring to light counsel's regrettable endeavor to complicate the

summary judgment record.  Second, the effort will underscore the dearth of evidence supporting

Plaintiff's frail case. Third, because counsel neglected to include any meaningful discussion of the evidentiary record in the argument portion of Plaintiff's summary judgment response, if I do not engage counsel's evidentiary machinations, Plaintiff's legal arguments will seem incoherent.

## 2. Factual Background

Plaintiff, born March 25, 1949, began working for Defendant in 1963. (Pl.'s 2d Resp., Statement of Add'l Disputed Facts [hereinafter "Add'l SOF"] ¶ 1; *admitted at* Def.'s Reply, Resp. Concerning Undisputed Facts [hereinafter "Add'l SOF Resp."] ¶ 1.) Plaintiff was fifty-five years old at the time of his termination in July 2004. (Def.'s Br., Statement of Undisputed Material Facts [hereinafter "SOF"] ¶¶ 1–2; *admitted at* Pl.'s 2d Resp., Resp. to Statement of Undisputed Material Facts [hereinafter "SOF Resp."] ¶¶ 1–2.)

### a. Performance: 1972 to 1999

#### i. Early Performance

In 1972, Plaintiff was named the Unit Manager for Defendant's Canon City, Colorado, facility, overseeing such things as inventory, sales, and customer relations. (*Id.*, SOF ¶ 3; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 3.) By 1982, the facility's gross revenues had tripled. (Pl.'s 2d Resp., Add'l SOF ¶ 7; *admitted at* Def.'s Reply, Add'l SOF Resp. ¶ 7.)

#### ii. Urrutia Reviews

From 1984 to 1999, Richard Urrutia supervised Plaintiff's work as Unit Manager. (*Id.*, Add'l SOF ¶ 12; *admitted at* Def.'s Reply, Add'l SOF Resp. ¶ 12; Def.'s Br., SOF ¶ 4; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 4.) From 1984 through 1987, Defendant rated an employee's performance by categorizing it as marginal, fair, commendable, superior, or distinguished. (*See*

Pl.'s 2d Resp, Ex. 1[2] [1984 Review].)[1] From 1984 to 1987, Mr. Urrutia gave Plaintiff "superior minus" ratings. (*See id.*, Ex. 1[1] [1983 Review], Ex. 1[2] [1984 Review], Ex. 2 [1985 Review], Ex. 3[1] [1986 Review], Ex. 3[2] [1987 Review].)

From 1988 onward, Defendant rated an employee's performance on three levels: (1) below performance; (2) on target; and (3) above target. (Def.'s Br., SOF ¶ 5; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 5.) In 1988 and 1989, Plaintiff received "on target" ratings. (Pl.'s 2d Resp., Add'l SOF ¶¶ 17–18; *admitted at* Def.'s Reply, Add'l SOF Resp. ¶¶ 17–18.) From 1990 to 1995, Plaintiff received "above target" ratings. (*Id.*, Add'l SOF ¶¶ 19–24; *admitted in relevant part at* Def.'s Reply, Add'l SOF Resp. ¶¶ 19–24.)

From 1996 to 1998, Mr. Urrutia gave Plaintiff "on target" ratings. (Def.'s Br., SOF ¶ 8; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 8.) While Plaintiff's 1998 performance review was generally favorable, Mr. Urrutia noted: "[I]n 1999 it is essential that [Plaintiff] become more proactive in identifying the cause of problems and developing an immediate action plan to overcome and resolve the[m]." (*Id.*, Ex. A–2[1] [1998 Review].)

---

[1]The parties' evidentiary submissions evince a wanton disregard for this court's local rules. *See* D.C.COLO.LCivR 56.1C (2007) (requiring exhibits to be individually numbered and submitted). Where, contrary to this rule, a party has submitted one exhibit containing a handful of distinct documents, I cite first to the properly numbered initial exhibit and then parenthetically to the relevant document according to the order in which it appears in the exhibit — thus, the second document in Plaintiff's first exhibit is cited to as "Ex. 1(2)." Where numerous deposition exhibits are improperly affixed to a properly numbered exhibit, I cite first to the properly numbered exhibit and then parenthetically to the deposition exhibit by the number it has been given — thus, deposition exhibit thirty-two to Defendant's exasperating eighty-six-page-long first exhibit is cited to as "Ex. A–1(32)." Where affidavits and depositions are not numbered, I cite to them in the order in which they appear on the docket as: (1) "Exhibit A1," "Exhibit A2," and so on for affidavits; and (2) "Exhibit D1," "Exhibit D2," and so on for depositions. I admonish the parties for wasting time with such trifling matters.

### b.     Beijer Supervision

In February 1999, Scott Beijer replaced Mr. Urrutia as Plaintiff's immediate supervisor. (*Id.*, SOF ¶ 8; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 8.)  Memoranda from Mr. Beijer to Plaintiff reveal that Mr. Beijer perceived performance problems relating to, among other things, Plaintiff's failure to get his subordinates to pull out-of-date products, notwithstanding Plaintiff's representations that he had addressed the problems.  (Pl.'s 2d Resp., Ex. 24[3] [7/13/99 Mem.]; *see id.*, Ex. 24[1] [6/22/99 Mem.], Ex. 24[2] [6/28/99 Mem.].)  Mr. Beijer testified that he told Plaintiff his performance was unacceptable.  (Def.'s Br., SOF ¶ 28; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 28.)[2]

A letter addressed to Plaintiff dated May 10, 1999, was found in Mr. Beijer's files after the close of discovery in this case.  (Pl.'s 2d Resp., Add'l SOF ¶¶ 30–31; *admitted in relevant part at* Def.'s Reply, Add'l SOF Resp. ¶¶ 30–31.)  The unsigned letter states: "As your manager has just informed you, your employment has been terminated effective today."  (*Id.*, Ex. 40 [5/10/99 Letter].)  Plaintiff did not receive the letter and was not terminated.  (*Id.*, Ex. A4 ¶ 4 [Pl. Suppl. Aff.].)  Mr. Beijer testified that he did not recall why the letter was created, but that it appeared to be the cover letter to a severance communication package.  (*Id.*, Add'l SOF ¶ 32; *admitted at*

---

[2]Here and elsewhere, Plaintiff admits Defendant's factual proffers "with clarification." (*See* Pl.'s 2d Resp., SOF Resp. ¶¶ 9–11, 14, 22, 27–30, 38, 50–52, 54, 76–77, 88, 90, 102–03, 110, 125–30, 132.)  Plaintiff's "clarifications" contain anywhere between one paragraph and three pages of "clarifying" averments, which tend only to be tangentially related to Defendant's averments and are clearly intended to muddy the summary judgment record.  (*See id.*)  I admonish Plaintiff for his transparent gamesmanship and note his egregious failure to follow my procedural rules, which require *brief* denials of factual averments and instruct Plaintiff to outline factual disputes overlooked by Defendant in the section of his brief to be titled "Statement of Additional Disputed Facts" — not in "clarifying" responses.  (Practice Standards — Civil: Special Instructions Concerning Motions for Summary Judgment ¶¶ 4–5.)

Def.'s Reply, Add'l SOF Resp. ¶ 32; *id.*, Ex. D5 at 14 [Beijer Suppl. Dep.].) Mr. Beijer further testified that such a letter would have been generated under either of two sets of circumstances: (1) if Plaintiff had been terminated; or (2) if Plaintiff, Mr. Beijer, or a human resources manager had requested to know what severance benefits were available to Plaintiff. (*Id.*, Ex. D5 at 18–19 [Beijer Suppl. Dep.].)

Plaintiff's personal notes from June 1999 state: "[Mr. Beijer] called to meet at [a grocery store] upset [sic] that a [sic] R2D2 barrel was being used [for a competitor's] [d]isplay. Told [sic] me I was making too much money." (Def.'s Br., Ex. A–1[32] [Pl. Planner Notes]; Pl.'s 2d Resp., Ex. D1 at 231 [Pl. Dep.].) In deposition, Plaintiff alleged that during this confrontation, Mr. Beijer made a derogatory age-based remark when he said: "You're making too much money. You need to go ahead and leave and have a nice summer." (Def.'s Br., SOF ¶ 113; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 113.)

Assistant Manager David DeHerrera, who was hired in September 1999, believes that Mr. Beijer wanted to "get rid" of Plaintiff and treated Plaintiff unfairly. (Pl.'s 2d Resp., Add'l SOF ¶¶ 37–45; *admitted at* Def.'s Reply, Add'l SOF Resp. ¶¶ 37–45.) In Plaintiff's 1999 performance review, Mr. Beijer rated Plaintiff as "below target," noting that Plaintiff failed to implement basic cost control measures. (Def.'s Br., SOF ¶ 29; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 29.) Mr. Beijer further noted that Plaintiff's facility: (1) had not achieved basic merchandising standards; (2) required more help from other facilities than any other facility in its region; (3) had an increase in workplace accidents; and (4) had a two-hundred percent turnover rate. (*Id.*) Mr. Beijer concluded the evaluation with this warning: "If there's not an immediate reversal of these trends,

[Plaintiff] will not make it through 2000." (*Id.*, SOF ¶ 30; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 30.)

### c.    Demotion

Although Mr. Beijer asserts that a senior executive, Eric Reinhart, instructed him to fire Plaintiff in September 2000, Mr. Beijer instead demoted Plaintiff. (*Id.*, SOF ¶¶ 32–33; *previously admitted at* Pl.'s 1st Resp., SOF Resp. ¶¶ 32–33; *deemed admitted at* Pl.'s 2d Resp., SOF Resp. ¶¶ 32–33; *id.*, Ex. A–4 at 62–65 [Beijer Dep.].)[3]  To create a position for Plaintiff, Mr. Beijer split a Food Service Representative ("FSR") position formerly filled by one person, Rick Montoya, into two jobs. (*Id.*)  Although the parties neglected to explain the job duties of an FSR, I gather that it is sales job which principally involves establishing and maintaining relationships with restaurants, convenience stores, and other establishments that sell beverages through soda fountains, vending machines, and refrigerated displays. (*See, e.g.*, *id.*, Ex. A–1[14] [2001 Review].)

Effective October 30, 2000, Plaintiff accepted the FSR position, which required him to work out of Defendant's Pueblo, Colorado, facility. (*Id.*, SOF ¶ 36; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 36.)  Plaintiff's salary and benefits were not impacted by the job change. (Pl.'s 2d Resp., Ex. D1 at 67 [Pl. Dep.])

---

[3]Plaintiff denies Mr. Beijer's testimony as a "self-serving attempt to legitimize [his] actions," essentially arguing that the testimony is inconsistent with Plaintiff's perception that Mr. Beijer had it out for him from the beginning of his tenure as Plaintiff's boss. (Pl.'s 2d Resp., SOF Resp. ¶¶ 32–33.)  Plaintiff's perceptions fail to disprove Mr. Beijer's assertion that he had permission to fire Plaintiff but instead created a new position for him.  Thus, Defendant's contrary proffer is deemed admitted.

In Plaintiff's 2000 performance review, which focused on Plaintiff's performance in his previous role, Mr. Beijer again rated Plaintiff "below target," noting many problems similar to those listed in Plaintiff's 1999 review. (Def.'s Br., SOF ¶ 37; *previously admitted at* Pl.'s 1st Resp., SOF Resp. ¶ 37; *deemed admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 37; *id.*, Ex. A–4 at 69–71 [Beijer Dep.].)[4]

### d.      FSR Performance

#### i.      Beijer Review

In Plaintiff's 2001 performance review, Mr. Beijer gave Plaintiff an "on target" rating, noting Plaintiff achieved his placement numbers, grew net profits, and made significant sales. (*Id.*, Ex. A–1[14] [2001 Review].)  Mr. Beijer also wrote that Plaintiff needed "to continue to be more methodical in his approach and consistent in his followup." (*Id.*)

#### ii.      Knowles Observations

In late 2001 or early 2002, manager Lyndon Knowles observed a number of Plaintiff's sales calls, noting that Plaintiff's approach differed from that of his counterparts in that "he did not seem to prepare for his sales calls," but rather "walk[ed] in and wing[ed] it." (*Id.*, SOF ¶ 43; *previously admitted at* Pl.'s 1st Resp., SOF Resp. ¶ 43; *deemed admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 43; *id.*, Ex. A–7 ¶¶ 4, 6 [Knowles Aff.].)[5]

---

[4]Plaintiff asserts he should not have been given a below-target rating based on the fact that Mr. Beijer answered "I don't remember . . ." to a question regarding the basis of one particular criticism in the 2000 review. (Pl.'s 2d Resp., SOF Resp. ¶ 37.)  While Plaintiff is correct that Mr. Beijer started his answer by stating "I don't remember . . .", Plaintiff neglects to mention that Mr. Beijer proceeded to offer a reasoned basis for the criticism in question. (*Id.*, Ex. D2 at 155 [Beijer Dep.].)  Defendant's proffer is deemed admitted.

[5]Plaintiff denies this fact, asserting "[t]here is no written documentation to support these statements.  These are subjective conclusions and differ with [Mr.] Beijer's 2001 on[-]target

### iii.    *Quintana Observations and Review*

In January 2002, Pat Quintana became Plaintiff's immediate supervisor.  (*Id.*, SOF ¶ 46; *previously admitted at* Pl.'s 1st Resp., SOF Resp. ¶ 46; *deemed admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 46.)  At the time, Defendant began requiring its FSRs to become certified in and utilize a sales process known by the acronym "PEPSI."  (*Id.*, Ex. A–6 ¶ 5 [Quintana Aff.].)  The PESPI process sets forth clear and consistent guidelines for how FSRs are to sell products and maintain sales relationships.  (*Id.*, SOF ¶ 40; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 40.)  Plaintiff was one of very few FSRs to fail the PEPSI certification test following a training seminar in Dallas, Texas.  (*Id.*, SOF ¶ 50; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 50.)  Although Plaintiff eventually passed the test, he admitted that he avoided using the PEPSI sales process because he felt that his customers, as "small town people," did not need "any bells and whistles" and preferred "an honest, straightforward approach."  (Pl.'s 2d Resp., Ex. D1 at 93 [Pl. Dep.].)

In 2002, Mr. Quintana observed a number of Plaintiff's sales calls, noting Plaintiff did not appear comfortable in front of customers, had an inflexible style, and failed to follow the PEPSI format.  (Def.'s Br., Ex. A–6 ¶ 7 [Quintana Aff.].)  In Plaintiff's 2002 performance review, Mr.

---

evaluation of [Plaintiff].  These statements appear for the first time in [Mr.] Knowles [sic] March 14, 2006 affidavit.  [Defendant] has not shown that it was in possession of this information at the time of [Plaintiff's] termination."  (Pl.'s 2d Resp., SOF Resp. ¶ 43.)  Plaintiff's denial suffers multiple flaws.  First, the fact that there is no "written documentation" supporting Mr. Knowles' recollections does not render them untrue.  Second, Plaintiff misrepresents the record when he states that Mr. Knowles' conclusions differ from Mr. Beijer's 2001 review: Mr. Beijer's 2001 comment that Plaintiff needed "to continue to be more methodical in his approach" is consistent with Mr. Knowles' observation that Plaintiff "wing[ed]" his sales calls.  Third, whether Defendant "was in possession" of Mr. Knowles' impressions at the time of Plaintiff's termination is entirely irrelevant to the question of their veracity.  Thus, Defendant's well-supported averment is deemed admitted.

Quintana gave Plaintiff a "below target" rating, noting Plaintiff's profitability numbers showed "mixed results." (*Id.*, Ex. A–1[15] [2002 Review].)[6] While Mr. Quintana indicated Plaintiff had a strength for "[l]ocal [c]ustomer [f]ocus," he also noted that Plaintiff should work to improve by "continu[ing] to develop his PEPSI selling technique." (*Id.*)

Mr. Quintana represents that during his tenure overseeing FSRs, Plaintiff was his second worst employee. (*Id.*, SOF ¶ 57; *previously admitted at* Pl.'s 1st Resp., SOF Resp. ¶ 57; *deemed admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 57; *id.*, Ex. A–6 ¶ 12 [Quintana Aff.].)[7] In deposition, Plaintiff characterized Mr. Quintana as "a good supervisor" who "was honest with [him]," but Plaintiff also claimed that Mr. Quintana was involved in a plan to "manag[e] [him] out of the business." (Pl.'s 2d. Resp., Ex. D1 at 84 [Pl. Dep.].)

---

[6]Plaintiff attempts to deny the veracity of his "below target" 2002 rating by relying heavily on interim sales reports from 2003. (Pl.'s 2d Resp., SOF Resp. ¶ 53.) Plaintiff fails to explain how interim numbers from 2003 undermine his 2002 review. (*Id.*) Plaintiff also points to one discrete aspect of his 2002 review — a comparison of product placement to the volume sold. (*Id.*) Plaintiff offers no explanation of what these numbers mean. (*Id.*) I note that volume and placement numbers are but one isolated aspect of much broader statistical performance review. (*See* Def.'s Br., Ex. A–1[15] [2002 Review].) Plaintiff also points out that the review states that "equipment placement" profitability numbers were measured with an "audit tool that [was] a work in progress." (*See id.*, Ex. A–1[15] [2002 Review].) Plaintiff's citations reveal the same "audit tool" was used to measure *all* FSRs. (*See* Pl.'s 2d Resp., SOF Resp. ¶ 53.) Plaintiff neglects to argue if or how the audit tool unfairly impacted him. (*Id.*) Thus, none of Plaintiff's proffered evidence serves to undermine Mr. Quintana's assessment.

[7]Plaintiff denies Mr. Quintana's representation, citing to a string of evidence ranging from the generally irrelevant to the brazenly irrelevant. (Pl.'s 2d Resp., SOF Resp. ¶ 57.) The *best* evidence to which Plaintiff cites are two pages of undated "sales per placement" figures for Plaintiff and another FSR, Rick Montoya. (*Id.*, Ex. 27[1] [Productivity Summary].) Even assuming the figures show Plaintiff outperformed Mr. Montoya in the "sales per placement" category, the fact that the figures are undated and unexplained eviscerates their probity.

### iv.    *Barnett Observations and Review*

In April 2003, Derrick Barnett became Plaintiff's immediate supervisor.  (Def.'s Br., SOF ¶ 58; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 58.)  Mr. Barnett required his FSRs to use "Sales Pad" laptop computers more extensively than did Mr. Quintana, adding new programs to the Sales Pad system.  (*Id.*, SOF ¶ 61; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 61.)  Plaintiff admits that he is "not a computer person" and the Sales Pad "was probably harder for [him] to work with than a lot of people."  (*Id.*, SOF ¶ 62; *deemed admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 62; Pl.'s 2d Resp., Ex. D1 at 108 [Pl. Dep.].)[8]

Mr. Barnett observed Plaintiff having problems with the Sales Pad's new "100% Ready to Sell" program (the "RTS Program"), which required Plaintiff to input a customer's sales data into a spreadsheet to create an customized "PowerPoint" presentation for the buyer.  (Def.'s Br., SOF ¶ 63; *previously admitted at* Pl.'s 1st Resp., SOF Resp. ¶ 63; *deemed admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 63; *id.*, Ex. A–8 at 155–58 [Barnett Dep.].)[9]  Mr. Barnett observed that Plaintiff had

---

[8]In support of his denial of his own testimony, Plaintiff points to his *2002* review, written by *Mr. Quintana*, which notes that Plaintiff mastered the Sales Pad.  (Pl.'s 2d Resp., SOF Resp. ¶ 62.)  In light of admitted fact number sixty-one, this citation is irrelevant.  Additionally, Plaintiff cites to a seven-page span of his own testimony, which also fails to support his denial.  (*Id.*)  Thus, Defendant's well-supported proffer is deemed admitted.

[9]Plaintiff denies this fact based on his recollection that Mr. Barnett only *once* observed him prior to his 2003 performance review, whereas Mr. Barnett testified that he observed Plaintiff "on a couple of occasions" prior to the review.  (Pl.'s 2d Resp., SOF Resp. ¶ 63; *see* Def.'s Br., Ex. A–8 at 157 [Barnett Dep.].)  Plaintiff further points out that Mr. Barnett has no notes of his observations.  (Pl.'s 2d Resp., SOF Resp. ¶ 63.)  Finally, Plaintiff emphasizes that Mr. Barnett admitted the RTS Program continues to give some FSRs problems to this day.  (*Id.*)  None of Plaintiff's averments undermine the asserted fact.  Nevertheless, Plaintiff incorporates this denial as the sole basis for his denials of Defendant's asserted facts numbers sixty-four, sixty-six, and sixty-seven.  (*Id.*, SOF Resp. ¶¶ 64, 66–67.)  Thus, Defendant's contrary factual proffers — which are actually supported by competent evidence — are hereby deemed admitted.  (*See* Def.'s Br., SOF ¶¶ 64, 66–67.)

problems entering figures into the spreadsheet and linking those figures to the sales presentation. (*Id.*, SOF ¶ 64; *previously admitted at* Pl.'s 1st Resp., SOF Resp. ¶ 64; *deemed admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 64; *id.*, Ex. A–8 at 157–58 [Barnett Dep.].)  Mr. Barnett also observed Plaintiff having trouble using the PEPSI sales process.  (*Id.*, SOF ¶ 65; *previously admitted at* Pl.'s 1st Resp., SOF Resp. ¶ 65; *deemed admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 65; *id.*, Ex. A–8 at 158–59 [Barnett Dep.].)[10]  Overall, Mr. Barnett felt Plaintiff struggled with "articulat[ing] a selling story that can tell the customers to buy our products."  (*Id.*, SOF ¶ 66; *previously admitted at* Pl.'s 1st Resp., SOF Resp. ¶ 66; *deemed admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 66; *id.*, Ex. A–8 at 158–59 [Barnett Dep.].)

### *v.* *Danger Observations*

On or about July 29, 2003, Regional Sales Manager Rick Danger contacted Mr. Barnett regarding the loss of several of Plaintiff's customers over a short period of time.  (*Id.*, SOF ¶ 70; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 70.)  One customer complained to Mr. Danger about Plaintiff's failure to follow through on a promise to sponsor a bowling tournament.  (*Id.*, SOF ¶ 73; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 73.)  Another customer complained that he had contacted Plaintiff after being solicited by Defendant's competitor, but Plaintiff failed to return the call.  (*Id.*, SOF ¶ 74; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 74.)  Further, Mr. Danger had once accompanied Plaintiff on a sales call, during which Plaintiff's performance was so poor that Mr.

---

[10]Fantastically, Plaintiff denies this proffer, asserting that "[Mr.] Barnett made a conflicting statement" and citing to Plaintiff's 2003 performance review.  (Pl.'s 2d Resp., SOF Resp. ¶ 65.) However, in the review, Mr. Barnett states: "the *difficulty you had in grasping the [PEPSI] selling concept* . . . highlighted a deficiency in your skill level.  (*Id.*, Ex. 15 [2003 Review] [emphasis added].)

Danger felt compelled to step in and take over.  (*Id.*, SOF ¶ 75; *deemed admitted at* Pl.'s 2d

Resp., SOF Resp. ¶ 75; Pl.'s 2d Resp., Ex. D3 at 128–29 [Danger Dep.].)[11]

### *vi.* *Vanegas Observations*

On November 23, 2003, Business Development Manager Miguel Vanegas accompanied

Plaintiff on a day of sales calls.  (Def.'s Br., SOF ¶ 77; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶

77.)  Mr. Vanegas regularly conducted such "work-with" days, observing FSRs and offering

constructive feedback.  (*Id.*, SOF ¶ 78; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 78.)  Mr.

Vanegas recalls that Plaintiff appeared nervous, unprepared, and generally lost on his calls.  (*Id.*,

SOF ¶ 79; *previously admitted at* Pl.'s 1st Resp., SOF Resp. ¶ 79; *deemed admitted at* Pl.'s 2d

Resp., SOF Resp. ¶ 79; *id.*, Ex. A–9 ¶ 5 [Vanegas Aff.].)[12]  Plaintiff struggled with the RTS

Program, using it so poorly in his second sales call that Mr. Vanegas took over the presentation.

(*Id.*, SOF ¶ 81; *previously admitted at* Pl.'s 1st Resp., SOF Resp. ¶ 81; *deemed admitted at* Pl.'s

2d Resp., SOF Resp. ¶ 81; *id.*, Ex. A–9 ¶ 5 [Vanegas Aff.].)  After the day of sales calls, Mr.

Vanegas worked with Plaintiff to practice using the RTS Program and advised further practice.

---

[11]Plaintiff denies this fact, asserting he "did not fail, as described by [Mr.] Danger."  (Pl.'s
2d Resp., SOF Resp. ¶ 75 [citing *id.*, Ex. D1 at 37, 41, 89–90, 96–97, 100–01].)  As Defendant
rightly notes, "[n]ot one of the citations listed by [Plaintiff] pertains to the occasion when [Mr.]
Danger accompanied [Plaintiff] on a sales call."  (Def.'s Reply, SOF Reply ¶ 75.)

[12]Plaintiff denies this fact, relying in part on conclusory assertions dispatched above in
footnote six.  (Pl.'s 2d Resp., SOF Resp. ¶ 79.)  Plaintiff also improperly bases his denial on: (1)
patently irrelevant performance data from 1997; and (2) notes from Mr. Vanegas' Palm Pilot,
which reveal that, during the first sales presentation, Mr. Vanegas observed that Plaintiff
"[a]ppeared lost" using the RTS program, was "utterly nervous," and actually "broke [a] tea
kettle."  (*Id.* [citing *id.*, Ex. 38 (1997 Data); Def.'s Br., Ex. A–9(1) (11/23/03 Notes)].)
Inexplicably, Plaintiff incorporates this unflattering evidence as the sole basis for his denial of four
more of Defendant's asserted facts, which are also hereby deemed admitted.  (*See* Def.'s Br., SOF
¶¶ 80–83; *deemed admitted at* Pl.'s 2d Resp., SOF Resp. ¶¶ 80–83.)

(*Id.*, SOF ¶ 83; *previously admitted at* Pl.'s 1st Resp., SOF Resp. ¶ 83; *deemed admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 83; *id.*, Ex. A–9 ¶ 5 [Vanegas Aff.].)

### e.    Termination

#### i.    Plaintiff's 2003 Performance Review

In March 2004, Mr. Barnett met with Plaintiff to deliver his 2003 performance review, in which Plaintiff again received a "below target" rating. (*Id.*, Ex. A–1[21] [2003 Review].) Mr. Barnett wrote:

> You rank [seventh] amoung [sic] your [ten] counter parts. [sic] Your years of experience have afforded you some success with equipment placements. However, the difficulty you had grasping the [PEPSI] selling concept, utilizing Sales Pad effectively and the problems you had presenting [the RTS Program] highlighted a deficiency in your skill level. The amount of assistance you received from your coworkers to complete reports and presentations further highlighted the difficulty you continue to have executing in your current role. [Your] ability to utilize current selling tools and processes makes it very difficult for him [sic] to achieve an average level of success versus your peers. [You] ha[ve] continued to have a downward performance trend. These performance outages must be addressed immediately.

(*Id.*)[13]

---

[13]In keeping with the unique intersection of opacity, laxity, and mendacity that is the hallmark of Plaintiff's factual averments, Plaintiff denies the veracity of the review, venturing a variety of ill-advised arguments. (Pl.'s 2d Resp., SOF Resp. ¶ 84; *previously admitted at* Pl.'s 1st Resp., SOF Resp. ¶ 84.) First, Plaintiff emphasizes that his "total volume measurement" put him at fifth out of his ten counterparts. (*Id.*) Plaintiff does not dispute, however, that his *overall* performance was sufficiently low to bring him down to seventh place. (*See id.*) Continuing this transparent ruse, Plaintiff next points out that he met seven of the nine objectives in one box at the top of the third page of his review. (*Id.*) However, Plaintiff's review is six pages long and contains many other boxes that remain unmentioned. (*See* Def.'s Br., Ex. A–1[21] [2003 Review].) Plaintiff then takes a different tack, stating that he had "nearly identical numbers" to those of twenty-five-year-old FSR Shawn Early, who was ranked third. (Pl.'s 2d Resp., SOF Resp. ¶ 84.) Plaintiff neglects, however, to explain what "numbers" he is referring to or how the "numbers" of those FSRs who were ranked fourth, fifth, or sixth were any less "nearly identical" to Plaintiff's numbers than were Mr. Early's. (*Id.*) Finally — and most dishonestly — Plaintiff argues that the measures upon which Mr. Barnett based Plaintiff's below-target rating were

## ii.    *Performance Improvement Plan*

On March 30, 2004, Mr. Barnett met with Plaintiff and presented him with a ninety-day performance improvement plan, along with a letter detailing the reasons for the plan.  (*Id.*, SOF ¶ 90; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 90.)  Three people made the decision to put Plaintiff on the improvement plan: (1) Mr. Barnett, (2) Mr. Barnett's supervisor, Rob Caprioglio, and (3) Regional Human Resources Manager Renee Cedeno.  (*Id.*, SOF ¶ 91; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 91.)  Ms. Cedeno had reviewed Plaintiff's personnel filed and noted that three different managers over a five-year period had rated Plaintiff's performance as "below target." (*Id.*, Ex. A–3 at 45–46, 48–49 [Cedeno Dep.].)  Plaintiff agrees that all of the goals included in the plan were goals expected of every FSR.  (*Id.*, SOF ¶ 94; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 94.)

Mr. Barnett met with Plaintiff four to five times during the pendency of the plan, and the two spoke almost every day regarding Plaintiff's progress.  (*Id.*, SOF ¶ 97; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 97.)  Additionally, Mr. Barnett observed Plaintiff on sales calls on three separate days.  (*Id.*, SOF ¶ 100; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 100.)  On May 26, 2004, Mr. Barnett observed Plaintiff, noting that he needed to improve his sales approach and process. (*Id.*, SOF ¶ 101; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 101.)  On June 23, 2004, Mr. Barnett again observed Plaintiff, noting he: (1) continued to struggle with the PEPSI format; (2) did not communicate opportunities and details; (3) was not prepared with materials necessary for a successful sale; and (4) had trouble locating information on the Sales Pad.  (*Id.*, SOF ¶ 102;

---

sheerly subjective.  (*Id.*)  However, when asked in deposition what led to Plaintiff's below-target rating, Mr. Barnett's first response was that Plaintiff ranked seventh out of his ten counterparts in sales.  (*Id.*, Ex. D4 at 69–70 [Barnett Dep.].)

*admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 102.)  On July 14, 2004,  Mr. Barnett observed and noted that Plaintiff: (1) did not customize his presentations to highlight opportunities; (2) did not use sales tools to prepare for calls; and (3) did not follow the sales platform.  (*Id.*, SOF ¶ 103; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 103.)  Mr. Barnett did, however, tick a box indicating that Plaintiff "[d]emonstrated [c]ompetence."  (*Id.*, Ex. A–1[28] [7/14/04 Observation].)

In June 2004, Plaintiff went to Dallas, Texas, for training and re-certification in the PEPSI sales process.  (*Id.*, Ex. A–1 at 98 [Pl. Dep.].)  Plaintiff failed the recertification test, which was conducted by Bob Sheehan, a Vice President who had not previously met Plaintiff.  (*Id.*, Ex. A–1 at 99–100 [Pl. Dep.].)

As the improvement plan's ninety-day period drew to a close, Mr. Barnett decided to recommend Plaintiff's termination because of his history of poor performance and his failure of the recertification test.  (*Id.*, SOF ¶ 107; *previously admitted at* Pl.'s 1st Resp., SOF Resp. ¶ 107; *deemed admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 107; *id.*, Ex. A–8 at 134 [Barnett Dep.].)[14]  Mr. Barnett, Ms. Cedeno, and General Manager Chris Harr made the decision to terminate Plaintiff. (*Id.*, SOF ¶ 108; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 108; *id.*, Ex. A–3 at 47 [Cedeno Aff.]; Pl.'s 2d Resp., Ex. D4 at 134 [Barnett Dep.].)  In July 2004, Defendant offered Plaintiff a severance package, including the opportunity to resign and take early retirement, which Plaintiff

---

[14]Plaintiff denies this proffer, stating: "[Plaintiff] had no history of poor performance. The[] [p]lan was both a sham and a set-up."  (Pl.'s 2d Resp., SOF Resp. ¶ 107.)  In support, Plaintiff cites to his *2003* performance review.  (*Id.*)  In rejecting the relevance of Plaintiff's comparison, Defendant emphasizes that an interim report from mid-2004 reveals that Plaintiff had dropped from seventh place in the 2003 FSR rankings into a tie for eighth place, while two of three FSRs who had been ranked below Plaintiff in 2003 had moved ahead of Plaintiff and the third FSR had held steady in eighth place.  (Def.'s Reply, SOF Reply ¶ 107 [citing *id.*, Ex. A–17[1] ¶¶ 6–9 (Barnett Aff.)].)  Thus, Defendant's well-supported proffer is deemed admitted.

declined. (*Id.*, Ex. D1 at 187 [Pl. Dep.].) On July 21, 2004, Mr. Barnett met with Plaintiff and terminated his employment. (Def.'s Br., SOF ¶ 110; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 110.) Plaintiff asserts that Mr. Barnett told him: "I don't like you and I don't want you here, you have not met my expectations and I don't want you around here." (Pl.'s 2d Resp., Add'l SOF ¶ 54; *admitted at* Def.'s Reply, Add'l SOF Resp. ¶ 54.) After Plaintiff's termination, his position was eliminated and his duties were reassigned to Mr. Montoya — who was forty-one at the time — and to two employees in Denver, Colorado. (Def.'s Br., SOF ¶¶ 120, 133–34; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶¶ 120, 133–34.)

### f.    *Allegations*

#### i.    *Discriminatory Remarks*

Plaintiff alleges that Mitch Cox (whose position remains unidentified), Mr. Vanegas, and Mr. Quintana all asked him about his retirement plans. (*Id.*, SOF ¶ 114; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 114.) Plaintiff asserts that shortly after he became eligible for early retirement, Ms. Cedeno told him he was old enough to retire — a statement Plaintiff perceives as derogatory. (*Id.*, SOF ¶ 116; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 116.) Plaintiff alleges that Mr. Danger asked him when he was going to retire "six, [maybe] eight" times. (Pl.'s 2d Resp., Ex. D1 at 196 [Pl. Dep.].) Plaintiff further alleges that Mr. Danger referred to him as "old man" at least once and also said "as long as we have these long[-]time employees here none of these new programs are ever going to work." (*Id.*, Ex. D1 at 191 [Pl. Dep.].) Plaintiff does not recall Mr. Barnett ever making any age-related comments to him. (*Id.*, Ex. D1 at 202 [Pl. Dep.].)

### ii.    Statistics

Plaintiff asserts that "about [ten percent] of . . . workers" in the state of Colorado in an unmentioned year were fifty-five to sixty-four years old.  (*Id.*, Add'l SOF ¶ 61; *denied at* Def.'s Reply, Add'l SOF Resp. ¶ 61.)  Plaintiff also presents a chart suggesting that less than ten percent of Defendant's Colorado employees were over fifty years old in 2004 and 2005.  (*Id.*, Add'l SOF ¶ 60; *denied at* Def.'s Reply, Add'l SOF Resp. ¶ 60.)

## ANALYSIS

### 1.    Legal Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c) (2007); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).  The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(e) (2007).  A fact in dispute is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a

reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

**2.     *Evaluation of Claims***

To prove his claim for age discrimination, Plaintiff need not show that age was "the sole motivating factor in the employment decision." *Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir. 1995) (citations and quotation marks omitted). Rather, Plaintiff need show only that his age was "a reason for the employer's decision and that it was the factor that made a difference." *Id.*

The parties agree that Plaintiff lacks direct evidence of discrimination. (*See* Def.'s Br. at 20; Pl.'s 2d Resp. at 44.) Thus, Plaintiff's case must proceed under the familiar *McDonnell Douglas* burden-shifting scheme. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* scheme, Plaintiff bears the burden of establishing a *prima facie* case of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). A *prima facie* case of age discrimination consists of proof that: (1) Plaintiff is within the protected age group; (2) he was doing satisfactory work; (3) he was discharged; and (4) his position was filled by a younger person or he was treated less favorably than younger counterparts. *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998); *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1315–16 (10th Cir. 1999), *overruled on other grounds by AMTRAK v.*

*Morgan*, 536 U.S. 101 (2002).  At the *prima facie* stage, Plaintiff's burden is not onerous.  *Orr v. City of Albuquerque,* 417 F.3d 1144, 1149 (10th Cir. 2005).  Establishment of the *prima facie* case creates a presumption that Defendant unlawfully discriminated against Plaintiff.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

Once Plaintiff comes forward with *prima facie* proof, the burden of production shifts to Defendant to articulate a facially nondiscriminatory reason for its decision.  *Reeves*, 530 U.S. at 143.  If Defendant meets its burden of production, the presumptions dissolve and Plaintiff must prove his termination was motivated by discriminatory intent.  *Id.*  Such a showing is generally made with evidence that an employer's proffered reason for termination is a pretext for discrimination.  Pretext may be shown "by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002).  The Tenth Circuit has repeatedly recognized that an employment discrimination plaintiff can defeat summary judgment by demonstrating that an evaluation offered to justify his termination conflicts with other assessments of his work performance.  *Platero v. Baumer*, 98 F. App'x 819, 821 (10th Cir. 2004) (collecting published cases).

In the instant case, Defendant asserts poor performance as its legitimate, nondiscriminatory reason for terminating Plaintiff.  (Def.'s Br. at 23–26.)  In light of the posture of the evidence, the scope of the parties' arguments, and the unique facts of this case, the question whether Plaintiff was doing "satisfactory work" is key both to Plaintiff's *prima facie* case and to

his pretext arguments. Thus, I find it would be unproductive to address the question first under the lesser *prima facie* standard and then return to it at the pretext stage of the analysis. Accordingly, I presume that Plaintiff has established a *prima facie* case of discrimination and proceed to assess the central question in the case: whether Plaintiff has come forward with evidence of pretext sufficient to support the conclusion that his termination was discriminatory.

Defendant emphasizes that seven different superiors — Messrs. Urrutia, Beijer, Knowles, Quintana, Barnett, Danger, and Vanegas — consistently observed Plaintiff's poor performance. (Def.'s Br. at 24–26.) Plaintiff attempts to rebut Defendant's arguments in a number of ways:

1. By showing Defendant either failed to consider its own conflicting, objective evidence or intentionally disregarded its own objective evidence. *Platero*[], [98 F. App'x 819].
2. By presenting evidence of Mr. Phillips' counterparts' similar performance, but dissimilar treatment;
3. By presenting evidence of the treatment of other [of Defendant's] employees over the age of [fifty] that is similar to [Defendant's] treatment of Plaintiff;
4. By presenting evidence of Defendant's repeated ageist statements over a five-year period of time;
5. By presenting evidence of the gross under-representation of persons over [fifty] years old.

(Pl.'s 2d Resp. at 46–47.) Additionally, Plaintiff argues: (6) the May 1999 termination letter recently discovered in Defendant's files "gives rise to an inference that [Defendant] made a decision to terminate without justification [and] then went on to build a case against Plaintiff over the next four years;" and (7) his "pretextural [sic] evidence mirrors the evidence" supporting an inference of pretext in *Garrett v. Hewlett-Packard*, 305 F.3d 1210 (10th Cir. 2002). (*Id.* at 47–52.) Other than five record citations Plaintiff includes in his *Garrett* argument, he neglects to cite the record throughout the entire course of his argument. (*See id.* at 46–52.) I first take

Plaintiff's arguments as a whole and then address them out of order, as they raise overlapping questions.

### a. *Failure to Cite the Record*

Unsupported, conclusory assertions are insufficient to create an issue of fact to overcome a motion for summary judgment. *Salehpoor v. Shahinpoor*, 358 F.3d 782, 789 (10th Cir. 2004). On summary judgment, the nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "[T]he requirement that the nonmovant specifically reference facts in its motion materials and the record is of special importance in an employment discrimination case," which typically involves reams of evidence spanning years of time. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998). Rather than bother to muster the effort to cite specific evidence in support of his bare-bones arguments, Plaintiff consistently leaves it to the court to divine how his arguments relate to the evidentiary record. (*See* Pl.'s 2d Resp. at 46–52.) However, "where the nonmovant failed to support his case with adequate specificity, [the Tenth Circuit] will not fault the [district] court for not searching the record on its own to make his case for him." *Espinoza v. Coca-Cola Enters., Inc.*, 167 F. App'x 743, 746 (10th Cir. 2006) (citations omitted). Consequently, the only argument raised by Plaintiff that actually merits further analysis is his comparison of his case to *Garrett*. All of Plaintiff's further arguments may be rejected out of hand as unsupported and conclusory.

### b. *Pretext Analysis*

Even assuming Plaintiff's summary judgment argument did not fail for lack of citation to the record, it would still fail because the record itself does not support Plaintiff's

arguments — which, perhaps, explains Plaintiff's failure to cite the record. Because Defendant

has engaged Plaintiff's generally conclusory arguments, I proceed to consider them below.

### i. Plaintiff's Performance Versus That of His Counterparts

Plaintiff asserts that Defendant wrongly relied on "subjective" analyses finding poor

performance, when his objective numbers revealed his performance was adequate in relation to his

peers. (Pl.'s 2d Resp. at 46, 48–49.) The main "objective" evidence upon which Plaintiff *appears*

to rely are interim FSR rankings from 2003, the year in which Plaintiff' year-end rank was seventh

out of ten FSRs. (*See id.* at 48–49, SOF Resp. ¶¶ 71, 53, Ex. 28[1] [2003 Period 4 Scorecard],

Ex. 28[5] [2003 Period 7 Scorecard], Ex. 30 [2003 Period 11 Scorecard]; Def.'s Br., Ex.

A–1[21] [2003 Review].) Without pointing to any evidence explaining the import of the interim

rankings in relation to the year-end ranking, Plaintiff then argues: "[s]ummary judgment must be

denied, unless . . . [Defendant] offers objective evidence which shows that not only was [Plaintiff],

ranked number [seven], terminated, but so were the number [eight], [nine], and [ten]

counterparts." (Pl.'s 2d Resp. at 49.) I disagree.

I fail to see how the interim 2003 scorecards help Plaintiff's case. Plaintiff was terminated

in July 2004, not in 2003. (*Id.*, Add'l SOF ¶ 1; *admitted at* Def.'s Resp., Add'l SOF Resp. ¶ 1.)

An interim report from mid-*2004* revealed that: (1) two of the three FSRs whose numbers had

fallen below Plaintiff in the final 2003 ranking had since moved *ahead* of Plaintiff; and (2) unlike

Plaintiff, the remaining FSR had not dropped, but instead remained in eighth place. (Def.'s Reply,

Ex. A–17[1] ¶¶ 6–9 [Barnett Aff.], Ex. A–17[2] [2004 Period 6 Scorecard].) Moreover, Plaintiff

was the only FSR in the rankings to fail the PEPSI recertification test in June 2004 — and he

failed it while he was on the ninety-day performance improvement plan. (Def.'s Br., SOF ¶ 95;

*admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 95; *id.*, Ex. A–1 at 98–100 [Pl. Dep.], Ex. A–1[17]

[PEPSI Recert. Results].)  Also while on the improvement plan, Plaintiff continued to struggle to

use PEPSI, the RTS Program, the Sales Pad, and to come prepared to sales calls.  (*Id.*, SOF ¶¶

100–03; *admitted at* Pl.'s 2d Resp., Resp. to SOF ¶¶ 100–03.)  These criticisms are strikingly

similar to those made in Plaintiff's FSR performance reviews dating back to 2001.  (*See id.*, Ex.

A–1[14] [2001 Review], Ex. A–1[15] [2002 Review], Ex. A–1[21] [2003 Review].)  Thus, there

is a broad array of evidence indicating that Plaintiff's unsatisfactory performance was most *un*like

that of his counterparts — not only was it widely documented in multiple forms over a number of

years by different observers, but it also trended continuously downward, even after Plaintiff was

placed on an improvement plan.

　　　　Elsewhere in his brief, with a perfunctory effort to explain the import of the sales numbers

contained in his performance review, Plaintiff points to his performance in isolated categories and

insinuates that because his numbers in those individual categories were not the worst of the lot,

there was no basis for his consistently low evaluations.  (*See, e.g.*, Pl.'s 2d Resp., SOF Resp. ¶¶

53, 84.)  However, "[s]atisfactory performance in some areas does not tend to show the falsity of

the [employer's] proffered reasons of deficient performance in other areas."  *Wallace v. Beech

Aircraft Corp.*, 87 F. Supp. 2d 1138, 1150 (D. Kan. 2000) (citation and quotation marks

omitted).

　　　　To the extent Plaintiff argues an inference of discriminatory intent may be reasonably

drawn from the fact that Defendant relied, at least in part, on "subjective" observations of

Plaintiff, rather than exclusively upon hard sales numbers, I reject such argument on two

independent grounds.  (*See* Pl.'s 2d Resp. at 48.)  First, at least six observers over Plaintiff's

tenure as an FSR consistently found his sales approach to be unprepared, nervous, poorly executed, and at variance with the PEPSI format. (Def.'s Br., Ex. A–1[27] [Barnett Eval.], Ex. A–5 at 128–29 [Danger Dep.], Ex. A–6 ¶ 7 [Quintana Aff.], Ex. A–7 ¶ 6 [Knowles Aff.], Ex. A–8 at 158–59 [Barnett Dep.], Ex. A–9 ¶ 5 [Vanegas Aff.].) Additionally: (1) Plaintiff twice failed the PEPSI certification test, which required him to make a mock sales pitch to a superior with whom he did not work; and (2) on more than one occasion, those called upon to observe Plaintiff's sales calls felt compelled to step in and take over his foundering presentations. (*See* Pl.'s 2d Resp., Ex. D1 at 95–96, 99–100 [Pl. Dep.]; Def.'s Br., Ex. A–5 at 128–29 [Danger Dep.], Ex. A–9 ¶ 5 [Vanegas Aff.].) The striking internal consistency of Defendant's evidence of Plaintiff's incapacity undermines any inference of underlying discriminatory animus. *Cf. Platero*, 98 F. App'x at 821 (finding pretext where "every criticism in [the employer's termination decision] was facially inconsistent with, if not in flat contradiction of, ratings the plaintiff received from her supervisor . . . during the year immediately preceding" the plaintiff's termination).

Additionally, Plaintiff overemphasizes his allegation that Defendant relied on "subjective" observations as the basis for his termination, when the key question is whether Defendant "honestly believed" those observations and "acted in good faith upon those beliefs." *Bullington*, 186 F.3d at 1318 (citing *Sanchez v. Philip Morris Inc.*, 992 F.2d 244, 247 [10th Cir. 1993] ["Title VII is not violated by the exercise of erroneous or even illogical business judgment."] [further citations omitted]). Instead of coming forward with evidence suggesting duplicity or bad faith, Plaintiff's repeatedly falls back on the following flawed logic: (1) Plaintiff's "numbers" reveal his performance as an FSR was satisfactory, therefore (2) Defendant's reliance on "subjective" measures of Plaintiff's performance masks its discriminatory animus. However, as

noted above, Plaintiff's objective numbers reveal that, unlike his counterparts, his performance as an FSR consistently trended downward. (*See, e.g.*, Def.'s Reply, Ex. A–17[1] ¶¶ 6–9 [Barnett Aff.], Ex. A–17[2] [2004 Period 6 Scorecard].) Thus, Plaintiff's sales statistics confirm — rather than undermine — the consistently negative "subjective" assessments of Plaintiff's performance. That Defendants took adverse action based upon such information hardly suggests bad faith.

Finally, I note that, other than Plaintiff's refusal to sign his performance improvement plan, the record is poignantly devoid of any efforts by Plaintiff to oppose the performance reviews that he presently derides as subjective and inaccurate. In deposition, Plaintiff stated that he "saw no reason to" argue about his reviews and that "[t]here was no accomplishment [sic] by doing it," but Plaintiff neglected — and continues to neglect — to explain why such a challenge would have been futile. (*See* Pl.'s 2d Resp., Ex. D1 at 87–88 [Pl. Dep.].) Thus, it appears that much of Plaintiff's pretext argument boils down to Plaintiff's *belief* that his performance reviews were unfair, as exemplified in the following exchange in his deposition:

> Q:   Mr. Barnett wrote . . . "[Plaintiff] lacks confidence and seems unsure when approaching the customer." Do you agree with that statement?
> A:   No. I would say that's one man's opinion.

(*Id.*, Ex. D1 at 166 [Pl. Dep.]; *accord id.*, Ex. D1 at 75–76, 84, 128 [Pl. Dep.].) However, Plaintiff's "own opinions about [his] qualifications do not give rise to a material fact dispute." *Bullington*, 186 F.3d at 1318. This is even more true where, as here, Plaintiff's own opinions are overwhelmed by the weight of evidence to the contrary.

### ii.     *"Ageist" Comments*

Plaintiff next contends that "repeated ageist statements" made by his superiors over a five-year period support an inference of pretext. (Pl.'s 2d Resp. at 46.) Plaintiff elaborates: "The evidence about retirement inquiries establishes an on- going [sic], unrelenting effort by more than half a dozen of Plaintiff's superiors." (*Id.* at 51.) As detailed below, the bulk of Plaintiff's allegations of purportedly age-based remarks fail on two independent grounds: (1) general inquiries into retirement plans fail to support an inference of bias; and (2) Plaintiff has failed to establish a nexus between the remarks and his termination.

"[A] company has a legitimate interest in learning its employees' plans for the future, and it would be absurd to deter [] inquiries [into employees' plans for retirement] by treating them as evidence of unlawful conduct." *Colosi v. Electri-Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1992). In the instant case, the vast majority of comments made to Plaintiff bear a striking resemblance to the sort of comments that the Sixth Circuit determined to have failed to support an inference of age-based bias in *Woythal v. Tex-Tenn Corp.*:

> Woythal claims that [his boss], [another supervisor], and others continued to ask him about his retirement "to the point that he believed he was being pressured to retire. . . ." However, . . . these questions about his plans for the future do not amount to evidence that Woythal's age was the reason for his departure from Tex-Tenn; in fact, he has not shown that anyone at Tex-Tenn made direct references to his age at all.

112 F.3d 243, 247 (6th Cir. 1997). With the exception of some comments Plaintiff attributes to Mr. Danger and one comment made by Mr. Beijer in 1999, every other comment Plaintiff characterizes as "ageist" is nothing more than an occasional comment on or inquiry into his retirement plans. (Pl.'s 2d Resp., Ex. D1 at 201–06, 231–34 [Pl. Dep.].) By 2000, Plaintiff had

worked for Defendant for over thirty-five years. (*See id.*, Add'l SOF ¶ 1; *admitted* at Def.'s Br., Add'l SOF Resp. ¶ 1.) Thus, the mere fact that a variety of Plaintiff's superiors asked him about his retirement plans hardly supports a reasonable inference that he was terminated based on his age. *Cf. Dunson v. Tri-Maint. & Contractors, Inc.*, 171 F. Supp. 2d 103, 111 (E.D.N.Y. 2001) (finding issue of fact as to pretext where, *inter alia*, supervisors questioned plaintiff about retirement, called plaintiff at home to follow up, marked plaintiff's birthday on a calendar along with the note "To Be Done," and fired him "just weeks" after the first retirement inquiry).

Even assuming the retirement inquiries might be construed as "ageist," they are wholly unrelated to Defendant's decision to terminate Plaintiff. A plaintiff "must demonstrate a nexus exists between . . . allegedly discriminatory statements and the [employer's] decision to terminate [him]." *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994); *accord Stover v. Martinez*, 382 F.3d 1064, 1077–78 (10th Cir. 2004). Thus, "age-related comments by non-decisionmakers are not material in showing the [employer's] action was based on age discrimination." *Cone*, 14 F.3d at 531. Furthermore, isolated or ambiguous comments are insufficient to support a finding of age discrimination. *Id.*; *accord Stover*, 382 F.3d at 1078. Additionally, as the gap in time between an alleged comment and the adverse action grows, the comment's probity on the issue of bias wanes. *See id.*; *accord Medina v. Ramsey Steel Co.*, 238 F.3d 674 (5th Cir. 2001). In the instant case, all of the purportedly age-based comments Plaintiff alleges fall into one or more of the above-mentioned categories, to wit: (1) comments made by a non-decisionmaker; (2) stray remarks; or (3) comments made long before Plaintiff was terminated.

In his deposition, Plaintiff appears to allege that Mr. Vanegas, Mr. Cox, Mr. Beijer, and Mr Quintana all made age-based comments to him. (Pl.'s 2d Resp., Ex. D1 at 198, 201–06, 231–34 [Pl. Dep.].) Plaintiff first testified that in November 2003, Mr. Vanegas[15] asked him: "When are you going to retire?" (*Id.*, Ex. D1 at 201 [Pl. Dep.].) Plaintiff responded: "[A]s soon as I . . . get Social Security." (*Id.*) Mr. Vanegas replied: "Good answer." (*Id.*) Plaintiff next alleges: "I think Mitch Cox asked me . . . [']When are you going to retire?[']" (*Id.*) And while Plaintiff does not specifically remember if Mr. Quintana asked him about his retirement plans, he "think[s]" Mr. Quintana may have made such an inquiry. (*Id.*) Finally, Plaintiff alleges that, in 1999, Mr. Beijer said: "You're making too much money. You need to go ahead and leave and have a nice summer." (*Id.*, Ex. D1 at 206, 231 [Pl. Dep.].) Even construing the facts in the light most favorable to Plaintiff, I find that these inquiries and comments are sufficiently isolated and ambiguous to belie any reasonable inference of discriminatory animus. More significantly, no one who made these comments was involved in the decision to terminate Plaintiff — it is undisputed that Mr. Barnett, Ms. Cedeno, and General Manager Chris Harr made the decision to terminate Plaintiff. (*Id.*, Ex. D4 at 134 [Barnett Dep.]; Def.'s Br., SOF ¶ 108; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 108; *id.*, Ex. A–3 at 47 [Cedeno Aff.].) Additionally, Plaintiff admits that the latest any of these comments was made was November 2003 — eight months prior to his termination. (*Id.*, SOF ¶ 115; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 115.) No reasonable juror would perceive a rational connection between these comments and Plaintiff's termination.

---

[15]Plaintiff actually alleges that "Miguel Vasquez" made these comments. (Pl.'s 2d Resp., Ex. D1 at 201 [Pl. Dep.].) Plaintiff does not dispute Defendant's attribution of the comments to Mr. Vanegas.

Plaintiff alleges that Ms. Cedeno once said to him, on an unstated date, "You're old enough to retire." (Pl.'s 2d Resp., Ex. D1 at 204 [Pl. Dep.].) Although Plaintiff admits that the statement was true, he feels "like it was definitely — definitely derogatory in my opinion. . . . Because it's not — it was early retirement[,] she didn't say early. . . . Early retirement to me is different than retirement, to me." (*Id.*, Ex. D1 at 204–05 [Pl. Dep.].) While Ms. Cedeno was a participant in the decision to terminate Plaintiff, this sole comment, based squarely on fact and made by a *human resources* employee, hardly supports a reasonable inference of discriminatory animus.

Plaintiff does allege that Mr. Danger asked him when he was going to retire "over and over" and would refer to him as "the old man." (*Id.*, Ex. D1 at 206 [Pl. Dep.].) Had Mr. Danger been involved in the decision to terminate Plaintiff, his comments might have come close to raising a reasonable inference of age-based bias. *Compare Roush v. KFC Nat'l Mgmt. Co.*, 10 F.3d 392, 396 (6th Cir. 1993) (inferring pretext where plaintiff's immediate supervisor referred to her as "old bag" or "old gummer"), *with Amon v. Cadec Design Sys., Inc.*, No. 00–11120, 2001 WL 498701, *1–2 (5th Cir. Apr. 13, 2001) (per curiam) (refusing to infer pretext notwithstanding supervisor's history of calling Plaintiff "old," "old fart," and "too old to cut the mustard"). Nowhere does Plaintiff allege that he ever reported Mr. Danger's comments to his supervisors. (*See* Pl.'s 2d Resp.) Plaintiff admits, however, that Mr. Danger last badgered him about his retirement plans eight months prior to his termination. (Def.'s Br., SOF ¶ 115; *admitted at* Pl.'s 2d Resp., SOF Resp. ¶ 115.) Additionally, Mr. Danger's job was to oversee Unit Managers, not FSRs. (Pl.'s 2d Resp., Ex. D3 at 17–19 [Danger Dep.].) Further, as just discussed, it is undisputed that Mr. Danger was not involved in the decision to fire Plaintiff. Consequently, Mr.

Danger's comments — while uncouth — fail to support an inference that Plaintiff was terminated based on his age. *See generally Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1182 (10th Cir. 2007) (noting that discrimination law does not stand as a bulwark against boorishness).

### iii.   Plaintiff's "Statistics"

Plaintiff argues that he has come forward with evidence "of the gross under-representation of persons over [fifty] years old." (Pl.'s 2d Resp. at 47, 51–52.)  Even assuming, momentarily, that Plaintiff had come forward with concrete evidence to that effect, it would be of little probative value:

> [I]n an individual disparate treatment case, the focus is on how and why an employer treated a particular individual the way it did. . . .  [B]ecause overall employment statistics have little bearing on the specific intentions of the employer in making particular hiring decisions, such statistical evidence will rarely suffice to rebut an employer's legitimate, nondiscriminatory reasons for a particular adverse employment action.

*Bullington*, 186 F.3d at 1319 (citing *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 848 [1st Cir. 1993]).

Plaintiff has not presented statistical data that would allow a reasonable trier of fact to infer that his termination was motivated by discriminatory intent.  Although he neglects to cite or discuss them in his argument, it appears that Plaintiff's evidence of "gross under-representation" consists of two suspect exhibits referenced in his statement of facts.  There, Plaintiff first cites to an unauthenticated January 2005 document apparently issued by the United States Census Bureau, titled "A Profile of Older Workers in Colorado," which reveals "that about [ten percent] of Colorado workers were [fifty-five] to [sixty] years old" as of *2002*.  (Pl.'s 2d Resp., Add'l SOF ¶ 61; *denied at* Def.'s Reply, Add'l SOF Resp. ¶ 60; *id.*, Ex. 36 at 3 [Census Report].)  Next,

Plaintiff cites to an untitled, undated document listing, *inter alia*, the names, job titles, and ages in 2004, 2005, and 2006 of an unspecified group of Defendant's Colorado employees.  (*Id.*, Add'l SOF ¶ 60; *denied at* Def.'s Reply, Add'l SOF Resp. ¶ 60; *id.*, Ex. 21 [Age Chart].)  Instead of discussing this evidentiary proffer, Plaintiff distills therefrom the following summary chart:

|                      | **2004** | **2005** |
|----------------------|------|------|
| **TOTAL EMPLOYEES**  | 106  | 110  |
| **EMPLOYEES 20–39**  | 47   | 52   |
| **EMPLOYEES 40–49**  | 47   | 48   |
| **EMPLOYEES 50–54**  | 7    | 8    |
| **EMPLOYEES 55–59**  | 4    | 2    |
| **EMPLOYEES 60+**    | 1    | 0    |

(*Id.*)  Defendant emphasizes that the exhibit underlying the chart contained employees "who held positions at *or above* [Plaintiff's] level from 2004 to 2006."  (Def.'s Reply, Add'l SOF Resp. ¶ 60 [emphasis added].)

Although he did not deign to draw any explicit conclusions from his "statistics," presumably Plaintiff believes they lend support to his unstated suggestion that the percentage of Defendant's employees at or above age fifty is: (1) at variance with the ten percent figure calculated by the Census Bureau for 2002; and (2) in decline.  Even assuming that the numbers might actually suggest this much,[16] as presented, Plaintiff's data are meaningless.  "[I]n order for

_____

[16]The application of elementary arithmetic to the data in Plaintiff's chart reveals that: (1) in 2004, eleven percent (*i.e.*, 12/106) of the workforce in the chart was over fifty; and (2) in 2005, nine percent (*i.e.*, 10/110) was over fifty.  (*See* Pl.'s 2d Resp., Add'l SOF ¶ 60.)  To the extent that the small sample size can yield reliable results, the difference between the two years is hardly eyebrow-raising.

statistical evidence to create an inference of discrimination, . . . [it] must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between *comparable* individuals." *Fallis v. Kerr-McGee Corp.*, 944 F.2d 743, 746 (10th Cir. 1991) (emphasis in original). By failing to parse out incomparable workers — *e.g.*, workers in positions other than Plaintiff's FSR job — Plaintiff failed to account for nondiscriminatory reasons for apparent numerical disparities. *See Cone*, 14 F.3d at 532 (to make a comparison demonstrating discrimination, plaintiff must show employees were similarly situated); *Medina v. Denver Pub. Sch.*, No. 05–cv–00299, 2006 WL 1795126, at *6 (D. Colo. June 27, 2006) ("Employees who hold different positions with different job duties are not similarly situated.").

Remarkably, when I undertook a comparison of the number of *FSRs* in 2004 with the number of FSRs in 2005, the data told a very different story: in 2004 there were two FSRs over the age of fifty and in 2005 there was one FSR over the age of fifty.[17] (*See* Pl.'s 2d Resp., Ex. 21 [Age Chart].) Given the wealth of evidence supporting the conclusion that the one over-fifty FSR terminated in 2004 was fired for poor performance, Plaintiff's "statistics" turn out to be beside the point.

### iv. The VanZandt Affidavit

Plaintiff next contends that other employees over the age of fifty were subjected to unfair treatment similar to that which he alleges. (*Id.* at 46, 60.) Although his argument is devoid of any record citation, I presume Plaintiff is attempting to refer to the affidavit of one Sharon VanZandt. (*See id.*, Ex. A3 [VanZandt Aff.].) I note that Ms. VanZandt was not an FSR, but rather was a

---

[17]Incidentally, by 2006, the number of FSRs over the age of fifty jumped up to three. (Pl.'s 2d Resp., Ex. 21 [Age Chart].)

secretary whom Defendant laid off at age fifty-two. (*Id.*, Ex. A3 ¶¶ 4–5 [VanZandt Aff.].) Ms. VanZandt alleges that she, too, "satisfactorily performed her job duties," but was laid off based on her age. (*See id.*, Ex. A3 ¶¶ 4–10 [VanZandt Aff.].) At best, Ms. VanZandt's testimony — suggesting *similar* treatment of *disparately* situated protected employees — is marginally relevant to the issue in this case: whether Plaintiff was terminated based on his age. *See Bullington*, 186 F.3d at 1319 (stating evidence having "little bearing on the specific intentions of the employer" will rarely show pretext); *see also Cone*, *supra*; *Medina*, *supra.* Moreover, "evidence that another employee believes [the plaintiff's employer] discriminated against him is insufficient to preclude summary judgment because that evidence constitutes merely a subjective belief of discrimination." *Babbar v. Ebadi*, 216 F.3d 1086 (table), 2000 WL 702428, at *7 (10th Cir. May 26, 2000).

Even setting the law aside, Ms. VanZandt's testimony is factually compromised. I take judicial notice of the fact that, after a full trial on the merits of her claim against Defendant for discharge in violation of the ADEA, an unanimous jury of ten concluded that Ms. VanZandt failed to prove that "her age was a determining factor in Defendant The Pepsi Bottling Group's decision to select her for lay off." (*VanZandt v. The Pepsi Bottling Group*, 06–cv–00148–WYD–CBS, Docket No. 72 at 2 [Final J.] [filed Sept. 27, 2007]); *see also St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979) (stating court may properly take judicial notice of its own records). Because Ms. VanZandt's allegations have been rejected by ten reasonable minds, no reasonable inference can be extrapolated from her affidavit to the instant case.

### v. **Comparison to** Garrett v. Hewlett-Packard

I turn to Plaintiff's contention that his "pretextural [sic] evidence mirrors the evidence" supporting a finding of pretext in *Garrett v. Hewlett-Packard*. (Pl.'s 2d Resp. at 47–52.) While Plaintiff spills much ink endeavoring to compare the evidence in this case to that in *Garrett* — a case where the plaintiff alleged race and age discrimination — the case is readily distinguishable on facts Plaintiff fails to mention.

In April 1990, Mr. Garrett, an over-forty, African-American Hewlett-Packard ("HP") engineer, took on a "'pioneering role'" in establishing "an internal diversity program aimed at promoting the hiring people of color and fostering relationships with minority firms." *Garrett*, 305 F.3d at 1214. Although Mr. Garrett's evaluations from 1986 to early 1990 ranked his performance as "very good," by mid-1990 his rank dropped to "good" and his evaluation included the suggestion that he "look at other possible career paths." *Id.* Thus, the Tenth Circuit concluded "[t]he period following Mr. Garrett's engagement in diversity actions at HP coincides with the distinct change in management attitudes towards Mr. Garrett." *Id.*; *see Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1195 (10th Cir. 2006) (noting that Mr. Garrett's "rankings had taken an abrupt turn for the worse almost immediately after [he] began organizing a pro-diversity committee at the work place"). The inference of bias was only redoubled by the fact that the rankings system which had turned so sharply against Mr. Garrett employed only "wholly subjective" criteria. *Garrett*, 305 F.3d at 1214, 1218. Thus, "when viewed in the aggregate," Mr. Garrett's evidence was sufficient to raise a genuine doubt about HP's motivations. *Id.* at 1220.

Here, unlike in *Garrett*, the downward trajectory in Plaintiff's performance reviews was unrelated to any protected conduct. (*See* Pl.'s 2d Resp. at 49–51.) Instead, the first "below

target" rating given to Plaintiff in 1999 comported with an overall drop in his performance ratings dating back to 1996. (*See* Def.'s Br., SOF ¶¶ 8–9; *admitted at* Pl.'s 2d Resp. ¶¶ 8–9.) Moreover, as also distinct from *Garrett*, the evidence here reveals that Defendant did not rely exclusively on "wholly subjective" performance reviews in finding Plaintiff's performance to be unsatisfactory: as discussed at length above, Plaintiff's hard sales numbers only confirmed overwhelmingly consistent subjective observations of Plaintiff's stagnantly poor performance. (*See Analysis*, § 2b[i], *supra*.) Thus, unlike the evidence in *Garrett*, the totality of the evidence here fails to raise a doubt regarding Defendant's stated reasons for terminating Plaintiff.

### vi.     The May 1999 Letter

Mistaking a molehill for a mountain, Plaintiff next argues that the May 1999 letter discovered in Mr. Beijer's files after the close of discovery "gives rise to an inference that [Defendant] made a decision to terminate [Plaintiff] without justification. [Defendant] then went on to build a case against Plaintiff over the next four years."[18] (Pl.'s 2d Resp. at 47.) Defendant responds: "From the mere existence of the unsigned, unsent May 10, 1999 draft severance letter, Plaintiff blindly leaps to the conclusion that there was a 'decision to terminate' [Plaintiff] at that time which was not carried out in order to build a paper trail." (Def.'s Reply at 31–32.) I find that the lack of evidence on this front would preclude any reasonable juror from joining Plaintiff in what Defendant has aptly termed a "blind leap."

---

[18]Elsewhere, Plaintiff elaborates: "After May 10, 1999, [Plaintiff] could do nothing right, according to [Defendant]. This unexplained termination decision gives rise to an inference that [Defendant] could not justify or support the termination of [Plaintiff] at that time. That [sic] [Defendant] stepped back from this decision in order to develop grounds for [Plaintiff's] termination. That [sic] from May 10, 1999, [Defendant] would begin an unrelenting effort to force [Plaintiff] to quit or to develop adequate grounds to justify his termination." (Pl.'s 2d Resp. at 3.)

Plaintiff imagines a vast conspiracy perpetrated by each and every person — Mr. Beijer, Mr. Knowles, Mr. Quintana, Mr. Barnett, Mr. Danger, Mr. Caprioglio, Mr. Vanegas, Ms. Cedeno, Mr. Cox, and Mr. Harr, *et al.* — involved in giving him negative feedback over the course of the five years that passed between the creation of the May 1999 letter and the date of his termination. (*See* Pl.'s 2d Resp. *passim.*) Despite the remarkable breadth and duration of this alleged conspiracy, Plaintiff has failed to come forward with any evidence suggesting the conspiracy ever materialized anywhere on this earthly plane. (*See id.*) While Plaintiff may not need evidence to be convinced of the conspiracy's existence, the law requires it. *See Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988) (stating that "mere conjecture . . . is an insufficient basis for denial of summary judgment"). Indeed, the only reasonable conclusion to draw from the entire body of the evidence presented in this case is that Plaintiff was, unfortunately, an ineffective salesperson. Startlingly, Plaintiff slips and actually admits as much: "[Defendant] terminated [Plaintiff] because, in their [sic] own words, he was very slow, seemed unsure, [and] appeared nervous and generally lost." (Pl.'s 2d Resp. at 52.)

Even assuming that Mr. Beijer discriminated against Plaintiff based on his age in demoting him from Unit Manager to FSR, Plaintiff has come forward with no evidence connecting any discrimination by Mr. Beijer — who ceased managing Plaintiff sometime in late 2001 or early 2002 — to Defendant's decision to terminate Plaintiff in 2004. (*See id.*) Plaintiff squarely admits that he is *not* suing based on the demotion: "[T]he only identified claim in this case is the one relating to [Plaintiff's] July 21, 2004 termination." (*Id.* at 43.) Rather, Plaintiff makes clear that he offers evidence relating to Mr. Beijer solely to present "the totality of the situation." (*Id.*) When viewed in the aggregate, the record fails to support a reasonable inference that any

discriminatory animus that may have been harbored by Mr. Beijer was carried forward into the decision to terminate Plaintiff. Consequently, the May 1999 letter is, at best, very marginal evidence. *See Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997) (stating "[t]he mere existence a scintilla of evidence . . . is insufficient to create a dispute of fact that is genuine"). Based on all of the foregoing, summary judgment is warranted.

*3.*    *Conclusion*

Based on the foregoing it is therefore ORDERED that:

1.    DEFENDANT's motion (#51) is GRANTED.

2.    The clerk shall forthwith enter judgment in favor of Defendant and against Plaintiff, dismissing Plaintiff's claims with prejudice. Defendant may have its costs by filing a bill of costs within eleven days of the date of this order.

Dated this 30th day of November, 2007

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge